EURASIA IMPORT CO., INC. v. UNITED STATES

**No. 6092.**—Invoices dated Kobe, Japan, June 30, 1939, etc.
Certified July 5, 1939, etc.
Entered at New York, N. Y., August 1, 1939, etc.
Entry No. 37360, etc.

Second Division, Appellate Term

(Decided February 2, 1945)

*James W. Bevans* for the appellant.

*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellee.

Before TILSON, KINCHELOE, and LAWRENCE, Judges; LAWRENCE, J., dissenting

TILSON, Judge: This application for a review of the decision of the trial court was filed under the provisions of section 501 of the Tariff Act of 1930. The merchandise consists of velveteens of cotton exported from Japan. Reappraisement 148616–A covers five invoices each of which was consulated on July 5, 1939, and entry of the merchandise was made at New York on August 1, 1939. Reappraisement 148653–A covers only two invoices, each of which was consulated on June 21, 1939, and entry of the merchandise was made at New York on August 8, 1939.

Two qualities of velveteens are covered by these two entries, designated as No. 100 and No. 200. Quality No. 100 was entered at ¥ .375, except where cut in 15-yard lengths, when it was entered at ¥ .380. Quality No. 200 was entered at ¥ .485, all net, packed. Quality No. 100 was appraised at ¥ .465 and quality No. 200 was appraised at ¥ .570, all net, packed. As found by the trial court "Foreign value is not involved, since it appears that merchandise of the type in issue was not permitted to be manufactured for domestic consumption in Japan at the time of exportation involved." Plaintiff concedes that export value is the proper basis for appraisement, but contends that such value at the time of exportation was lower than the appraised values, and, in fact, equalled the entered values."

The trial court found that the export values found by the appraiser were not disproved by the record, and accordingly found the appraised export values to be the proper dutiable values for the merchandise. In its opinion, the trial court stated that:

It appears that part of the difference between the entered and appraised values is to be found in two disputed items, one of a commission charged by the shipper of the merchandise, and the other a so-called export control fee.

While the above-quoted statement may be factually correct, it definitely appears from the record that the items of commission and control fee were given no consideration when the appraised values were advanced over the entered values. This is shown by the following quotations from the testimony of appellee's witness:

X Q. Mr. Christ, you stated that you based your appraisement of the merchandise in the instant cases on these various importations of merchandise by other importers, from other manufacturers?—A. That is right.

\*        \*        \*        \*        \*        \*        \*

X Q. Which one did you base it on, because they are all at different prices?— A. Mitsui's, which shows a price, a net price, of 46.5 f.o.b. net packed.

X Q. Now, let's examine these invoices. Exhibit No. 13 is an invoice of a shipment from Mitsui, Ltd. of Osaka to Mitsui in the United States. It states that the vessel sailed on the 26th of June, 1939, and the price is .54 yen per yard, c. i. f. New York.—A. That is right.

X Q. Now, is that the one you based it on?—A. Yes.

X Q. And how did you figure the 54—how did you figure that down to 46?— A. Less non-dutiable charges equal to about 14 per cent.

X Q. And that 14 per cent off makes 46?—A. 46½, yes.

\*        \*        \*        \*        \*        \*        \* \*

X Q. Haven't you, in the appraisement of merchandise imported by Mitsui in New York, had occasion to make such inquiry to determine the connection between the two companies? Haven't you ever made that inquiry?—A. I did inquire at times.

X Q. Yes. And from their answer you conclude that they are one, is that right?—A. Well, I think so.

\*        \*        \*        \*        \*        \*        \*

X Q. Notwithstanding that, you think that the sale, that the price quoted in this invoice by Mitsui, Japan, to Mitsui in New York, is a price at which Mitsui of Japan would freely and does freely offer, and sell, the merchandise to any buyer in the United States?—A. I do.

\*        \*        \*        \*        \*        \*        \*

X Q. \* \* \*. Well, then, the appraisement of quality 100 in the instant cases at 46½ was not arrived at by the inclusion, on your part, of association fees or commissions, but was arrived at by taking the price, the c. i. f. price of Mitsui?— A. That is right.

\*        \*        \*        \*        \*        \*        \*

X Q. \* \* \*. Point out there any indication that that 4 per cent commission was considered by you to be a dutiable item.—A. Do you mean do I consider it to be?

X Q. Yes. There is something in the appraisement record there. A. That is appraised on the basis of Mitsui's prices.

X Q. Exactly. So that the question in the instant case—the question of whether or not the commission was a part of the dutiable value, did not enter into it, did it?—A. No.

\*        \*        \*        \*        \*        \*        \*

R. X Q. Just a minute. In figuring on the appraisement in the instant cases, you did not indicate anywhere in your return that you considered this association fee a dutiable item, did you? * * * A. No, I did not.

The witness admitted that he did not know whether the prices shown on this invoice included the selling expenses in the United States of Mitsui of New York. The witness also admitted that he appraised the cotton velveteens on one of Dazian's invoices, exhibit No. 9, at .48 yen and that he appraised the cotton velveteens on one of Mitsui's invoices, exhibit No. 13, at only .46½ yen.

From the above testimony it appears clear that the items of commission and control fee did not enter into the difference between the entered and appraised values of the instant merchandise. It further appears from said testimony that the instant merchandise was appraised upon the basis of Mitsui's invoices with the knowledge that Mitsui of Japan was one and the same as Mitsui of New York, and without any knowledge as to whether or not the Mitsui invoices included the expense of Mitsui doing business in New York.

The above facts definitely destroy any presumption of correctness attaching to the finding of value by the appraiser. It is true that counsel for appellant contends that the items of commission and control fee are nondutiable, but this is not to say that the difference between the entered and appraised values is represented in part by these items of commission and control fee. The above testimony also is not in harmony with the following finding by the trial court:

It is clear that the control fee was considered part of the export value of the merchandise by the appraiser, and in view of the state of the record with reference to it, I am unable to hold otherwise.

The following statement is quoted from the decision of the trial court:

It is interesting to note that plaintiff's single witness, Jacob E. Parks, who stated he was in charge of all purchases for the plaintiff, testified that on May 5, 1939, an order was placed with Fujisaki Bros., a Japanese firm, for velveteen apparently similar to quality No. 100 on which a price of 18½ cents c.i.f. New York was paid. Deducting the charges for freight, insurance, cartage, petty expenses, consular fee, quota fee, quota auction fee, and buying commission, all of which were claimed to be non-dutiable and the amounts of which were not stated, Mr. Parks said that that price was equal to a cost of the merchandise of 37 sen per yard, or .37 yen, net, packed. However, it appears, by the calculations of the examiner who passed the merchandise in question, and who testified at the trial on behalf of the defendant, that a c.i.f. New York price of 15½ cents per yard for the same quality of merchandise was the equivalent of an f. o. b. Kobe price of .465 yen, net, packed, including the quota fees and buying commission. Unless the buying commission was more than the 4 per centum which the record shows was charged in the case at bar, or the other charges were greater, there is no explanation for the comparatively large difference between these prices.

The only testimony of witness Parks with reference to any purchase of cotton velveteens from Fujisaki Bros. and the price paid

therefor is found on pages 19, 133, and 134 of the record, and is as follows:

* * *. On May 5, 1939, we purchased from still another firm, the name is Fujisaki Bros. & Co., and the purchase price was 37 sen per yard.

* * * * * * *

Q. Mr. Parks, Exhibit No. 15, offered in evidence on behalf of the defendant, is an alleged offer from Fuji Bros., Japan, for cotton velveteens, 17 cents c. i. f. New York, dated April 21, 1939. Did you buy any velveteens from or through this firm at or about the date of this quotation?—A. No, but I believe that that is the same firm as Fujisaki Bros., except a different branch of it, and we did buy from Fujisaki Bros.

Q. You did buy from Fujisaki Bros.?—A. Yes.

Q. And what did you pay, what was the price?—A. What is the date?

Q. April 21, 1939. A. Well, we placed an order with Fujisaki Bros. on May 5, 1939, which is very close to that date, and we paid the equivalent of 18½ cents a yard, c. i. f. New York.

Q. And what was the basic price?—A. The basic price was 37 sen, as the cost of the merchandise, plus all charges, which makes up to 18½ cents converted at the then prevailing rate of exchange.

Q. What would those charges be?—A. Freight, insurance, cartage, petty expenses, consular fee, and then a quota fee, and a quota auction fee and buying commission.

Q. And with all those items, the non-dutiable—those items you believed non-dutiable, deducted, you arrived at what price in yen?—A. As the cost of the merchandise?

Q. Yes.—A. The cost of merchandise is 37 sen per yard.

Defendant's witness Siegelman also testified that:

Q. Have you a quotation there from Fujimaki?—A. Fujisaki.

Q. In 1939, asking, or giving you a quotation on some velveteens?—A. Well, now, here is the first one here. Here is a cable dated April 21, 1939, offering us cloth similar to Quality No. 100, or E, at 17 cents a yard, c. i. f. New York.

Accepting the testimony of witness Parks as establishing that Fuji Bros. "is the same firm as Fujisaki Bros., except a different branch of it, * * *" and also accepting the testimony of witness Siegelman as establishing that the cable dated April 21, 1939, addressed to J. C. Siegelman Co., Inc., and signed "FUJIBROS" refers to "cloth similar to Quality No. 100, or E, * * *" these facts do not even tend to establish that the velveteens which witness Parks testified his firm placed an order for with Fujisaki Bros. on May 5, 1939, were in any way similar to those velveteens covered by the cable, exhibit 15, addressed to J. C. Siegelman Co., Inc., dated April 21, 1939, and signed by FUJIBROS. In other words, conceding that the price quoted in the cable, exhibit 15, covered merchandise similar to quality No. 100, or E, the record contains not one word of evidence that the merchandise which witness Parks testified his firm ordered from Fujisaki Bros. on May 5, 1939, was quality No. 100, or E, or that the velveteens covered by said cable were similar to those which the plaintiff ordered on May 5, 1939, from Fujisaki Bros.

At the trial of this case counsel for the respective parties conceded that there was no foreign value for the instant merchandise.

Appellant's witness Parks testified that "during the six years that I have been with the firm, and every year during that period I might say almost every month during that period we bought merchandise from Cameron, and the quantity would probably run to several million yards." He also testified that he had been buying this particular merchandise for a period of 6 years; that he knew where the raw cotton is—where the woven gray cotton is bought; how it is finished and dyed and where it is sold; that he had familiarized himself with the markets and market conditions in Japan by talking with the men employed by appellant who had made a number of trips to Japan, also the general manager of Cameron & Co. and other Japanese exporters, from time to time.

This witness testified that Kobe, Japan, was the principal market for the sale of such or similar merchandise to that here involved. However, upon objection by opposing counsel, his answer was stricken.

The question of what constitutes the principal market for the sale of merchandise is a question of fact, and was so held by the Supreme Court of the United States in *Stairs* v. *Peaslee* (18 How. 521, 15 L. ed. 474), wherein Mr. Chief Justice Taney said:

* * *. What markets within these dominions were the principal ones for an article of this description was a question of fact, not of law * * *.

While witness Parks might have been more thoroughly qualified to testify concerning what constituted the principal market in Japan for the instant velveteens, it would appear that in view of the qualifications shown the motion to strike his testimony that Kobe was the principal market might well have been denied and his testimony left in the record for such consideration and weight as his qualifications warranted.

Further evidence that Kobe was one of the principal markets for the sale of velveteens such as and similar to those here involved is to be found in the two reports of the special agent, marked in evidence as defendant's exhibits 18 and 19. Exhibit No. 19 indicated one sale of No. 100 quality velveteens of 41,502¼ yards consummated at Kobe; another sale of 33,156½ yards of No. 200 quality consummated at Kobe; another sale of 21,000 yards of No. 200E quality consummated at Kobe; another sale of 32,400 yards of quality No. E consummated at Kobe; another sale of 56,677¾ yards No. 100 quality consummated at Kobe; and another sale of 6,600 yards quality No. 200D consummated at Kobe. Exhibit 18 shows the sale of between 300,000 and 400,000 yards of velveteens all consummated at Kobe, making a

total of practically one-half million yards. The sale of this quantity of velveteens in the city of Kobe would appear, in view of the quantity permitted to be exported under the quota system, to be ample evidence to establish Kobe as a principal market for the sale of velveteens.

While there is no direct testimony as to the amount of velveteens that constitute a wholesale quantity, or a usual wholesale quantity, an examination of the sales reported in the various exhibits in evidence in connection with the quantities involved in the shipments before the court shows that the quantities involved in these appeals are well within the usual wholesale quantities.

In connection with the usual wholesale quantity it should be remembered that the appraiser was required to find the usual wholesale quantity in making his appraisements in the instant appeals, and, the absence of any indication by him that he found that the quantities before the court were not usual wholesale quantities, we feel is, at least, a strong indication that he found such quantities to be usual wholesale quantities. As stated by Judge Lawrence at the argument of this appeal:

There is a presumption there, is there not, the appraiser has found a value in the principal market or markets of exportation at the time of exportation in the usual wholesale quantities and in the ordinary course of trade.

The views expressed in the above quotation find support in the case of *United States* v. *Freedman & Slater*, 25 C. C. P. A. 112, wherein the appellate court stated:

When the appraisement first came before the trial court, it must be presumed that the appraisement and all items thereof constituted the true valuation of the merchandise and the burden rested upon the party who challenged its correctness or the correctness of any of its items to prove otherwise. Section 501, Tariff Act of 1930.

The record contains evidence, however, that the price of the merchandise does not vary according to the quantity purchased, and this, of course, eliminates the necessity of finding a usual wholesale quantity.

In this connection we have in collective exhibit 1 numerous statements that:

*At this price*, we were willing to accept and sell freely, *any quantities* to all purchasers in this market. [Italics ours.]

The above quotation is given only for the purpose of showing that the price of the merchandise did not vary according to the quantity purchased, and is not used for the purpose of attempting to show a value for the merchandise.

As to the value of the imported velveteens, the following transactions are shown in exhibit 18:

One sale of 10,000 yards of quality #E100, dated April 6, 1939 ¢ ¥ .375 per yard.

One sale of 10,000 yards of quality #E100, dated April 6, 1939 ¢ ¥ .375 per yard.

One sale of 2,565 yards of quality #200, dated June 6, 1939 ¢ ¥ .495 per yard.

One sale of 32 pieces of quality #100, dated Sept. 20, 1939 ¢ ¥ .375 per yard.

One sale of 9 pieces of quality #200, dated Sept. 20, 1939 ¢ ¥ .495 per yard.

One sale of 30 pieces of quality #100, dated Sept. 20, 1939 ¢ ¥ .375 per yard.

One sale of 24,840 yards of quality #E (100) dated May 2, 1939 ¢ ¥ .37 per yard, packed ex Osaka.

One sale of 800 pieces of quality #200, dated May 17, 1939 ¢ ¥ .365 per yard.

One sale of about 18,000 yards of quality #100, dated April 14, 1939 ¢ ¥ .365 FOB Kobe.

One sale of 13,674 yards of quality #3300 (100), dated July 14, 1939 ¢ ¥ .375 packed ex Kobe.

One sale of 35,000 yards of quality #100, dated April 6, 1939 ¢ ¥ .375 per yard.

One sale of 15,000 yards of quality #900 (100), dated April 26, 1939 ¢ ¥ .36 packed ex Kobe.

As heretofore indicated the above transactions are taken from the evidence offered by the appellee, and, in view of the fact that all presumption of correctness in favor of the values found by the appraiser has been destroyed, and in view of the further fact that this evidence has not been rebutted by appellee, it would appear to be sufficient to establish a *prima facie* case in favor of the appellant.

With reference to any evidence offered by the appellee in rebuttal of the evidence offered by appellant, the trial court made the following observation:

* * *. During the course of the presentation of defendant's case the examiner of merchandise who examined and inspected the merchandise in issue was called to the stand and questioned as to the basis of the values which he recommended to the appraiser in connection with the appraisement of such merchandise.

If the purpose of the defendant in so doing was to rebut the evidence offered by the plaintiff by going forward and establishing the export value of the goods as defined by the statute, I am satisfied that it fell short of accomplishing that purpose. If the purpose was to establish the correctness of the appraiser's action, I am satisfied that it failed in that regard also.

From our review of the record, we feel that it shows an export value for quality No. 100 of .38 yen, packed ex Kobe, and for quality No. 200 of .495 yen, packed ex Kobe, which, as we understand, is equivalent to the entered values, except as to those items which were cut into 15-yard lengths and for which cutting there was an extra charge of ½ sen. This extra charge of ½ sen per yard should, of course, be added to the value of those items which were cut from 30-yard lengths to 15-yard lengths.

Considerable evidence was adduced and argument made concerning certain of the involved merchandise which was invoiced at a higher

value than the entered value. The record shows that this merchandise was purchased in 1937, at which time the price was higher than the price in 1939, when it was exported, and that this higher price included the higher purchase price and also certain charges. The value of imported merchandise is the value or price at which the same is sold or offered for sale at or about the date of exportation, and not the price paid some 2 years earlier plus certain charges not necessary to place the merchandise in condition packed ready for shipment to the United States.

Since it appears that the appraiser based his appraisement of the instant merchandise upon the prices of similar merchandise exported from Mitsui of Kobe to Mitsui of New York without giving any consideration to the items of purchasing commission and control fee, and since all the transactions reported by the special agent in exhibit No. 18 make no reference to the items of commissions or control fee, it is our view that this question is not before us in this case. Had the appraiser added the items of purchasing commission and control fee as dutiable items in arriving at his appraised value, and the importer contended these two items were nondutiable, or that the dutiable export value was the appraised value less these items, then a different question would be presented.

For the reasons heretofore stated the judgment of the trial court is reversed, and the case is remanded to the trial court for further proceedings not inconsistent with the views herein expressed. Judgment will be rendered accordingly.

### DISSENTING OPINION

LAWRENCE, Judge: I respectfully dissent from the conclusion reached herein by my associates.

Upon reviewing the record I am in accord with the finding of the trial judge—

* * * that the plaintiff has not established export values for the merchandise other than the values found by the appraiser.

Aside from any other consideration, there has been an utter failure on the part of the importer to establish the exact status of the so-called commission, and export control fee, in relation to the market value of the merchandise. I do not, of course, accede to the view of the majority that such items are not before the court for consideration.

Accordingly, it is my opinion that the decision and judgment appealed from should be affirmed.